In re Trust Created under the Last Will and Testament of Maude A. Parsons, for the benefit of Alan Trubshaw Parsons: Parsons (Alan Timothy), Appellant, v. Parsons (Cynthia Ann) and others, Respondents.

*No. 326. Argued November 1, 1972.—Decided January 3, 1973.*
(Also reported in 203 N. W. 2d 40.)

614

For the appellant there was a brief by *Christian R. Steinmetz* of Milwaukee, and oral argument by *Mr. Steinmetz* and *Alan A. Olshan* of Milwaukee.

For the respondents there was a brief by *von Briesen, Redmond & Schilling*, attorneys for Cynthia Ann Parsons and Linda M. Muhar, *Peter N. Brusky*, attorney, and *Ernst J. von Briesen*, guardian *ad litem* for Michael A. Parsons, all of Milwaukee, and oral argument by *Ernst J. von Briesen*.

ROBERT W. HANSEN, J. When the grandmother provided in her will for the children of her son, did she intend to provide for all four of his children, or only three of them?

Three children are, without dispute, to be included as intended beneficiaries of the grandmother. They are

Cynthia, Linda and Michael, children of the son by his prior wife.

The fourth child, about whom the dispute centers, is Alan. He is a child of the son by his last wife, and was born before the marriage of his parents.

Statutes and legal presumptions aside, there is nothing in this record to indicate that the grandmother would not have intended Alan's inclusion as one of the four children of her son. He was clearly a member of the family circle of father, mother and child. As such, he was the object or recipient of his parents' bounty, including their support and affection. There is nothing in this record to suggest that the grandmother, if she had lived, would have treated this grandchild any differently than did his parents.

The legal controversy as to what the grandmother must be presumed to have intended arises because the child, Alan, was born before the marriage of his father and mother, and that marriage was entered into without the required court permission. The father was under court order to provide for the support of a child of the prior marriage so court permission was required.[1] If Alan's parents had married before their child was born, during the one-year interlocutory period or even before the divorce was granted to the former wife, no question of the grandmother's intent would arise. As the child of a void marriage, under Wisconsin statutes the child born to them would be legitimate.[2] Similarly, the statutory

---

[1] Sec. 245.10, Stats., providing:

"(1) No Wisconsin resident having minor issue not in his custody and which he is under obligation to support by any court order or judgment, may marry in this state or elsewhere, without the order of either the court of this state which granted such judgment or support order, or the court having divorce jurisdiction in the county of this state where such minor issue resides or where the marriage license application is made."

[2] Sec. 245.25, Stats., providing:

"**Legitimation of children.** . . . The issue of all marriages declared void under the law shall, nevertheless, be legitimate."

provision for legitimation of children born out of wed-lock where their parents lawfully intermarry [3] by an eyelash falls short of reaching the situation here, because the marriage here is hardly lawful, being declared void by statute.[4] So, viewing each provision of the statute separately, the trial court held that the child, Alan, fell between them, uncovered and unlegitimated. While it is doubtful the legislature intended this narrow gap between the two legitimation provisions to exist, a separated and literal reading of the two provisions of the single section supports the trial court's conclusion that the gap exists, and that sec. 245.25, Stats., does not legitimate the child, Alan.[5]

[3] Sec. 245.25, Stats., providing:

"**Legitimation of children.** In any case where the father and mother of any child or children born out of wedlock shall lawfully intermarry, . . . such child or children shall thereby become legitimated and enjoy all the rights and privileges of legitimacy as if they had been born during the wedlock of their parents . . . ."

[4] Sec. 245.10(5), Stats., providing:

". . . Any marriage contracted without compliance with this section, where such compliance is required, shall be void, whether entered into in this state or elsewhere."

[5] Viewing sec. 245.25, Stats., as a single entity (*see: United States v. Freeman* (1845), 44 U. S. (3 How.) 556, 565); giving consideration to the object sought to be accomplished by the legitimation statute (*see: Loof v. Rural Mut. Casualty Ins. Co.* (1961), 14 Wis. 2d 512, 516, 111 N. W. 2d 583); avoiding a con-struction both unreasonable and absurd defeating the legislative intent (*see: Connell v. Luck* (1953), 264 Wis. 282, 285, 58 N. W. 2d 633); and construing the legitimation section to give it such meaning as the legislature intended (*see: State ex rel. Madison v. Industrial Comm.* (1932), 207 Wis. 652, 658, 242 N. W. 321); the writer would hold the statute to give a child born out of wedlock, whose parents intermarry, without securing required court per-mission, to be a child of a void marriage and, as such, legitimate under the statute. It is conceded that the point is not raised, briefed or argued on this appeal, and that such construction of the statute would not alter or affect the result reached on this appeal.

This legitimation of children statute clearly was enacted to mitigate what this court and others have termed "the old and harsh rules of the common law." [6] However, where the statute does not apply, it is to the old common-law rule that we must turn. That rule was that the word "children" when used in a will, prima facie meant legitimate children, unless the context or surrounding circumstances gave the reference a broader import. [7] While stating ". . . less evidence than under the old system will sufficiently show that the intention was to include illegitimate children, . . ." this court, back in 1898, accepted the common-law presumption as to intent. [8]

However, in two cases arising since 1898, this court has found the common-law presumption of intent to exclude illegitimate children rebutted by special circumstances. In the first, a situation where the only children in existence were illegitimate, and the testator knew of this fact, this court held that such knowledge was ". . . sufficient to rebut the presumption that legitimates only were intended . . . ." [9]

In a more recent case this court modified the *Kaufer* ruling to make the controlling presumption-rebutting factor to be whether or not the child was ". . . a part of the family circle or . . . was otherwise recognized by the testator as an object of his natural bounty." [10] We

---

[6] ". . . Every human instinct is moved toward extending a helping hand to such child [illegitimate], already laboring under a handicap impossible of removal. That is why the old and harsh rules of the common law have been modified and in many instances removed by statutory enactments." *Reilly v. Shapiro* (1936), 196 Minn. 376, 379, 265 N. W. 284, quoted with approval in *Estate of Traver* (1963), 18 Wis. 2d 416, 419, 118 N. W. 2d 932.

[7] *See:* 10 Am. Jur. 2d, *Bastards*, p. 942, sec. 136.

[8] *Will of Scholl* (1898), 100 Wis. 650, 660, 76 N. W. 616.

[9] *Will of Kaufer* (1931), 203 Wis. 299, 304, 234 N. W. 504.

[10] *Estate of Bohnsack* (1963), 20 Wis. 2d 448, 452, 122 N. W. 2d 443.

read the *Bohnsack Case* as in actuality making the test as to presumed intent of a testator to be whether the illegitimate child was or was not "a part of the family circle."

We find it is clear in *Bohnsack* that the court there was creating "a part of the family circle" test rather than seeking to narrow the number of situations excluded from the common-law presumption by *Kaufer*. In *Bohnsack*, the court opinion comments on "the injustice of the harsh common-law rule," [11] as well as on "the severity of the common-law rules concerning illegitimate children," [12] and notes "the trend toward ameliorating the treatment of illegitimates." [13] Following such less than complimentary references to the common-law presumption, the court in *Bohnsack* held that with the existence of the illegitimate issue known to the testator, it is also to be required that ". . . (1) the illegitimate was a part of the family circle or (2) was otherwise recognized by the testator as an object of his natural bounty." [14] Before us now is the question of how the *Bohnsack* rule or test is to apply to a situation where the testator died before the child involved was born.

In *Bohnsack* and *Kaufer*, the testator was alive at the time the children involved were born so knowledge of their existence or lack of knowledge was at least a highly relevant factor. In fact, it would be a rare combination of circumstances that would have an illegitimate grandchild "a part of the family circle" without the others in the extended family circle being aware of the newcomer's addition to the circle.

In the case before us, the grandmother died before the birth of the grandchild involved. That child clearly meets the "family circle" test on the nuclearized concept

[11] *Id.* at page 451.
[12] *Id.* at page 451.
[13] *Id.* at page 451.
[14] *Id.* at page 452.

of a family as including father, mother and children. However wide the "family circle," the grandmother could not be a member when the child joined it for the reason that she was no longer alive. We do not see the fact of the grandmother leaving the earthly scene before the birth of her grandchild as in any way affecting the entirely sound *Bohnsack* reasoning that an illegitimate child who was "a part of the family circle" was to be considered outside the common-law presumption. Knowledge vanishes as an appropriate additional test, where the Grim Reaper has made a testator's knowing of the existence of the child impossible. Since we deal solely with what the grandmother here intended, we see no valid reason for suspecting, much less presuming, that she intended to exclude from her reference to the children of her son a grandchild who was a member of the "family circle."

If being "a part of the family circle" is, as *Bohnsack* made it, the important consideration as to presumed intent, the child, Alan, here involved, meets the test. The fact that he was "a part of the family circle" we hold to be a sufficient circumstance, under the facts here, to rebut the common-law presumption that his grandmother intended to exclude him when she referred to the children of her son. We see this as an application of the "family circle" test in *Bohnsack* to a situation not then before the court. If some see it as an extension of *Bohnsack,* we have no objection to its being so considered. Dealing not with questions of heirship or legitimacy, but solely with the presumed intent of a testamentary reference to the children of her son, we hold that an illegitimate child of such son who was, as here, at all times "a part of the family circle" was and is included in the reference to "children" in his grandmother's will. The common-law presumption of intent to exclude has been adequately rebutted.

The trend over the years has been to mitigate the harshness of common-law approaches that visited upon the children the consequences of legal transgressions by their parents. The legitimation of children statute in this state is one evidence of such trend. Decisions of this court have recognized the harshness of the common-law rule as to presumed intent, and sought to narrow its full sweep. Legislatures and courts move toward the day in which there is fuller recognition of the rights of children born out of wedlock. As the United States Supreme Court recently put it:

"We start from the premise that illegitimate children are not 'nonpersons.' They are humans live, and have their being. They are clearly 'persons' . . . .
". . . Why should the illegitimate child be denied rights merely because of his birth out of wedlock? . . ." [15]

In the case before us, we deal with the intent of the grandmother, not with the rights of the grandchild. We believe that reversal and remand with directions to the county court to divide the Alan Trubshaw Parsons trust into four equal shares, one for each of his children, implements what the testator intended. We hold the appellant to be a child of his father under the terms of his grandmother's will.

*By the Court.*—Order reversed, and cause remanded for further proceedings not inconsistent with this opinion.

---

[15] *Levy v. Louisiana* (1968), 391 U. S. 68, 70, 71, 88 Sup. Ct. 1509, 20 L. Ed 2d 436.